IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| EVELYNN YOUNG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.  2:11-CV-97-ERW-SPM |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Michael J. Astrue, the Commissioner of Social Security, denying the applications of

Plaintiff Evelynn Young for disability insurance benefits, child's insurance benefits, and

supplemental social security income under Title II of the Social Security Act, 42 U.S.C. §§ 401

*et seq.*, and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (the "Act").  This

matter was referred to the undersigned United States Magistrate Judge for review and a

recommended disposition pursuant to 28 U.S.C. § 636(b).  The undersigned recommends that the

decision of the Commissioner be affirmed.

## I.      PROCEDURAL HISTORY

Plaintiff filed her applications for benefits under Titles II and XVI of the Act on January

16, 2009, claiming disability because of bipolar disorder, neck and spine injuries, knee problems,

and migraines, with an onset date of July 18, 2008.  (Tr. 78, 83, 154, 161, 164).  Plaintiff's

applications were denied initially.  (Tr. 78, 83).  A hearing was held before Larry D. Shepherd,

an Administrative Law Judge ("ALJ") on March 3, 2010. (Tr. 37-73). Following the hearing, on July 27, 2010, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. (Tr. 31). On October 28, 2011, the Appeals Council adopted the findings of the ALJ, with some modifications.[1] (Tr. 6-13). Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

In appealing the Commissioner's decision, Plaintiff argues that the ALJ improperly afforded no weight or inadequate weight to the opinions of psychologist Rebecca Still and Licensed Clinical Social Worker Laura Still.

## II. FACTUAL BACKGROUND[2]

### A. BACKGROUND

Plaintiff was born on March 17, 1989. (Tr. 41). She is single and lives with her boyfriend and infant daughter. (Tr. 42). She graduated from high school and has had no vocational training or college. (Tr. 42-43). In high school, she took special classes for reading and math; in other classes, she got Cs or Ds. (Tr. 46).

Plaintiff previously worked as a cashier at a convenience store for about two months. (Tr. 44). She quit working there because she was not able to remember to print certain lottery reports and because her drawer came up short two times. (Tr. 44, 48). She had difficulty counting the drawer because she would lose track of the numbers. (Tr. 48). She got into confrontations with her boss and co-workers when they criticized what she was doing, and she

---

[1] These modifications were unrelated to the issues presented in this appeal.

[2] The record includes evidence of both mental and physical impairments. However, because Plaintiff's sole argument on appeal is that the Commissioner failed to give appropriate weight to the opinions of the individuals who treated and/or examined her regarding her mental impairments, the following summary is limited to evidence related to Plaintiff's mental impairments.

would either yell at them or walk outside. (Tr. 45, 52). However, she did not get into quarrels or confrontations with customers. (Tr. 45). She testified that she often forgot to do tasks assigned to her, even after being reminded. (Tr. 51). She also got angry and walked away from the cash register about once or twice each time she worked. (Tr. 58). She missed work about once a week because of feeling overwhelmed or feeling anxiety. (Tr. 59).

Plaintiff has also worked in the past as a nurse's aide for four or five months. (Tr. 45). She was fired because "people wrote some statements on [her]," because she could not pay attention to just one thing, and because she was told to do vitals on a certain resident but did them on a completely different person. (Tr. 46, 48). She also had difficulties doing charting: she did not understand where the vitals were supposed to go, how she was supposed to write them in, or what it meant to write in numbers about how many times individuals had been incontinent. She had someone help her do the charting. She also sometimes got angry at the residents and would just leave. (Tr. 49). She also testified that she could not sit still for the hour and a half to two hours required for mealtime, because she fidgets and has to be moving some part of her body at all times. (Tr. 50). She also testified that she had difficulties concentrating on feeding one patient at a time. (Tr. 51).

Plaintiff has also worked doing telephone surveys for about three or four months. (Tr. 56-57). She found it difficult because she could not pronounce many of the people's names and because she could not handle rude people and would yell and cuss at them. (Tr. 57). She also testified that she had difficulties with her supervisors' criticisms of her work and that she once got up and left her station because of that. (Tr. 58).

Plaintiff testified that she was currently seeing Rebecca Still for her mental problems, as well as an associate of hers, Laura Still. She testified that she had been diagnosed with attention

deficit hyperactivity disorder ("ADHD"), anxiety, and depression. (Tr. 54). Plaintiff testified that she gets panic attacks anywhere from twice a day to twice a week, lasting for about thirty minutes. (Tr. 54-55). She sits on the floor, rocks back and forth, and feels like she cannot breathe. (Tr. 55). They are triggered by things that worry her. (Tr. 54-55).

Plaintiff testified that she has compulsive behavior about doing everything in twos. For example, she has to eat popcorn two pieces at a time, and if she reads a book, she has to read another book to make it even. She also has a certain order in which she does certain household tasks, and if it is disrupted, she has to start over from the beginning. (Tr. 60).

As of December 2009, Plaintiff was not taking any medication on a regular basis. (Tr. 62). As of the date of the hearing, she was taking Depakote,[3] Prozac,[4] Adderall,[5] and another medication she could not remember. (Tr. 63).

Plaintiff testified that she cannot stand to be around people or crowds and avoids stores when they are likely to be busy. She has only one friend. (Tr. 55). She does not go out to eat or do similar things. (Tr. 55-56). For entertainment, she watches television, plays with her daughter, or does puzzle books. (Tr. 56).

Plaintiff has some days when she does not get out of bed because she is depressed. (Tr. 59). She has had suicidal thoughts in the past but not for the last two or three years. (Tr. 59-60).

At home, Plaintiff changes her daughter, gives her bottles, and watches her play. (Tr. 61). She cannot just sit still and play with her and does not really read to her. (Tr. 63). Plaintiff starts doing household chores such as dishes, but she never finishes them. She is able to dress,

---

[3] Depakote is a brand name for valproic acid and is used to treat seizures and bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html
[4] Prozac is a brand name for fluoxetine and is used to treat depression, obsessive-compulsive disorder, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html
[5] Adderall is used for the treatment of attention deficit hyperactivity disorder. *Physician's Desk Reference*, 67th ed. (2013), at 2273.

bathe, and groom herself. She can fix herself a simple dinner. She watches law shows on television but usually does not understand what she is watching. (Tr. 64).

Plaintiff has a difficult time balancing her checkbook. (Tr. 61). She has some problems reading; she does not read books that are long or have long words in them, and she does not spell well. (Tr. 43). She can add and subtract but not multiply or divide; she could count out change. (Tr. 44).

## B. MEDICAL TREATMENT

On October 10, 2007, Plaintiff saw Dr. Jeffrey Davis, D.O. It was noted that on October 3, 2007, Plaintiff was involved in a motor vehicle accident and was "Life Flighted" with a neck injury to the University of Missouri in Columbia. Plaintiff reported that she was not sleeping well. Her depression screen was negative, but she was prescribed Elavil.[6] (Tr. 369). On November 29, 2007, Plaintiff was given Lexapro[7] for depression and anxiety. (Tr. 365).

On January 15, 2008, Plaintiff returned to Dr. Davis, reporting a history of bipolar disorder. She complained of mood swings, irritability, agitation, frequent outbursts of anger, and a history of cutting and hurting herself. Dr. Davis prescribed lithium.[8] (Tr. 362).

On several occasions in early 2008, Plaintiff returned to Dr. Davis for follow-up regarding her bipolar disorder. (Tr. 354-361). On January 29, she reported feeling much better since starting on lithium. Her mood was nondepressed, her affect was normal, and she had no suicidal ideation. She was assessed as having bipolar disorder, stable. (Tr. 361). On February 13, 2008, Plaintiff reported that she had had some episodes of paranoia and agitation, that she

---

[6] Elavil is a brand name for amitriptyline and is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html
[7] Lexapro is a brand name for escitalopram and is used to treat depression and generalized anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html
[8] Lithium is used to treat bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html

had gotten into a huge fight with her boyfriend, and that she had stopped taking the lithium two days prior because she felt that the paranoia and agitation were side effects. Dr. Davis discontinued lithium and started her on Depakote. (Tr. 360). On February 27, 2008, it was noted that Plaintiff's symptoms had been improved after discontinuing lithium and starting on the Depakote. (Tr. 358). On March 31, 2008, it was noted that Plaintiff was doing well on Depakote and wanted a refill. (Tr. 355).

On April 23, 2008, Plaintiff returned to Dr. Davis, reporting that she has stopped her Depakote due to the cost. She had a violent outburst at home, police were notified, and she was brought to the emergency department, treated, and released. She was nondepressed with a slightly flat affect and no acute mania or suicidal or homicidal ideation. Dr. Davis diagnosed her with bipolar disorder and prescribed valproic acid. (Tr. 354).

On July 1, 2008, Plaintiff was seen at the Northeast Missouri Family Health Clinic, and her depression screen was positive. It was noted that she had had a problem with her boyfriend. (Tr. 523). On a patient health questionnaire, she reported that on several days over the last two weeks, she had felt down, depressed, or hopeless; had little interest or pleasure in doing things; had poor appetite or overeating; and was either moving or speaking slowly or moving more often than usual. She also reported that nearly every day she had trouble falling asleep or sleeping too much and that she felt tired and had little energy. However, she stated that these problems had not made it difficult for her to do her work, take care of things at home, or get along with other people. (Tr. 522).

On July 9, 2008, Plaintiff returned and reported that she was not taking valproic acid for bipolar disorder. She was scheduled to see a licensed clinical social worker for evaluation. (Tr. 267). On September 30, 2009, Plaintiff returned to discuss her bipolar disorder. She stated that

she would like to resume valproic acid.  It was noted that she had a positive depression screen and that she was to take Depakote and Prozac.  It was also noted that she had a prescription for Xanax from Dr. Davis.  The impression was depression, other mood disorder, NOS; post-traumatic stress disorder by history; and general anxiety by history.  (Tr. 556).

On December 16, 2009, Plaintiff saw Laura Still, Licensed Clinical Social Worker. Laura Still noted that Plaintiff's medications were Depakote[9] and fluoxetine (Prozac).  Plaintiff was reported to be calm, good with her baby, open, and wanting to talk.  Laura Still noted that Plaintiff would be evaluated the next day and that counseling would continue.  (Tr. 546). Plaintiff returned to Laura Still on several occasions in late 2009 and early 2010.  (Tr. 539-41, 543, 545).  On December 27, 2009, Laura Still noted that Plaintiff was not feeling well, that her compulsions were still the same, and that she could relax at home but does not like to work because she does not like to be around people.  It was noted that she talked calmly and paid good attention to her baby.  (Tr. 543).  On January 19, 2010, Plaintiff returned, and Laura Still noted that Plaintiff gets by a day at a time.  (Tr. 541).  On January 27, 2010, Plaintiff returned, and Laura Still noted that Plaintiff was on Prozac and Depakote, that she did not think her medications were strong enough, and that they were working on getting her on Adderall.  Laura Still also noted that Plaintiff was angry and frustrated.  (Tr. 540).  On February 3, 2010, Plaintiff returned, and it was noted that she was not on Adderall yet and that her mood seemed better since starting her medications.  (Tr. 539).

Other progress notes from the Northeast Family Health Clinic from the December 2009 through January 2010 time frame indicate that Plaintiff had little support system, needed

---

[9]Notes state that Plaintiff was taking "Divalproex," which is apparently another name for valproic acid/Depakote.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html

strategies for coping with stress, and was advised to continue with Prozac and Depakote and add Adderall.  (Tr. 550, 553).

### C.  OPINION EVIDENCE AND CONSULTATIVE EXAMINATIONS

#### 1.  CONSULTATIVE EXAMINATION BY PSYCHOLOGIST JAMES L. TICHENOR, PH.D. – APRIL 1, 2009

On April 1, 2009, psychologist James L. Tichenor, Ph.D. examined Plaintiff and completed a psychological report.  (Tr. 305-07).  Dr. Tichenor reported that Plaintiff was dressed and groomed appropriately, and that her level of responsiveness was alert and vigilant but cooperative, with an underlying sense of irritability.  Her attention and concentration were low average.  Tests showed low average attention and concentration, low average cognitive processing efficiency, low average immediate memory function, and a deficit in abstraction ability.  (Tr. 305).  Her thought content showed a concern about her frequent bouts of anger and irritability and concern that her daughter, when born, would have the same problem.  (Tr. 305-06).  Her mood was mildly depressed and irritable.  Her insight and judgment were marginal but probably satisfactory enough to manage money with some limited supervision.  She reported a "rough" childhood involving abuse and stated that she has nightmares, flashbacks, and intrusive thoughts.  She reported having had significant anger and control problems since about age twelve.  She reported that she was fired from her job for yelling at her manager and was discontinued from counseling because she called her counselor a "bitch."  She reported obsessive compulsive behaviors of doing everything in twos, over-cleaning her coffee table, and doing things in a particular order.  (Tr. 306).

On a Beck Depression Inventory II, she reported depressive symptoms in the severe range.  On a bipolar screen, her reports indicated a very high likelihood of bipolar disorder.  (Tr. 306).

Dr. Tichenor concluded that Plaintiff's symptom report, history, and general irritability were consistent with depression and bipolar disorder and that her report would indicate significant problems with anxiety. He opined that her ability to understand and remember instructions and to attend and to complete tasks was likely impaired but not precluded. He also stated that her ability to satisfactorily get along interpersonally and to relate on a job site was "likely deficit." He stated that she could manage money with some minimal supervision. (Tr. 307).

Dr. Tichenor diagnosed bipolar disorder II, most recent episode depressed, post-traumatic stress disorder, alcohol and prescription medication abuse (in partial remission), and borderline personality disorder (provisional). He assessed a GAF of 55. (Tr. 307).

### 2. PSYCHIATRIC REVIEW TECHNIQUE FORM OF MARC MADDOX, PH.D. – APRIL 7, 2009

On April 7, 2009, Marc Maddox, Ph.D., a non-examining state psychologist, completed a Psychiatric Review Technique form for Plaintiff. (Tr. 308-19). He indicated that Plaintiff had medically determinable impairments of bipolar disorder, most recent episode depressed; post-traumatic stress disorder; borderline personality disorder; and alcohol and prescription medication abuse. (Tr. 311-14) He opined that Plaintiff had a mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace. He found insufficient evidence regarding episodes of decompensation. (Tr. 316).

Dr. Maddox also completed a Mental Residual Functional Capacity Assessment Form on the same day. (Tr. 320-22). Dr. Maddox stated that Plaintiff had the ability to complete simple, repetitive tasks in an unskilled work environment and could understand, carry out, and remember simple instructions. He stated that she could make simple work-related decisions and has the

ability to deal with routine changes in the work environment, though she may occasionally need more guidance and instruction than is typically offered. He stated that she had the ability to respond appropriately to supervisors and co-workers but that irritability might be evident. He opined that she would function best in a work setting where interpersonal contact was limited and where she could complete tasks relatively independently. (Tr. 322).

### 3. EVALUATION OF LAURA STILL, L.C.S.W. (DECEMBER 17, 2009)

On December 17, 2009, Plaintiff was evaluated by Laura Still, the licensed clinical social worker who went on to treat her for the next few months. (Tr. 534-535). Laura Still noted that Plaintiff was not taking medication on a regular basis. (Tr. 534). She noted that Plaintiff was irritable but not physically aggressive; had a temper; worried about many things; had to do certain behaviors in a certain order; did things in twos; was forgetful; was shy and nervous; found it difficult to complete tasks; and did not like to be around people. She noted that Plaintiff had never had a stable home and had a history of abuse. (Tr. 535).

### 4. PSYCHOLOGICAL EVALUATION OF REBECCA S. STILL, M.A., LICENSED PSYCHOLOGIST (DECEMBER 17, 2009)

On December 17, 2009, Rebecca Still, M.A., a licensed psychologist, conducted a psychological evaluation of Plaintiff. (Tr. 524-33). Rebecca Still observed that Plaintiff had no speech, hearing, or visual problems; that she appeared interested in the tasks and had an orderly approach; that there were moderate signs of anxiety and depression; that she sometimes needed reassurance; that she exhibited a flat affect; that her gross motor and fine motor skills were awkward; that she was "distractible and wiggly"; that she texted frequently during the evaluation; that she was in constant motion; that she had no difficulty understanding instructions; and that she was friendly and cooperative. (Tr. 524-25).

Rebecca Still also evaluated Plaintiff on several tests and scales. On the Conners' Adult ADHD Rating Scale, Plaintiff reported significant symptoms of ADHD. However, Ms. Still stated, "questions were answered in an inconsistent manner" and the results "are likely to be invalid." (Tr. 525). The Millon Clinical Multaxial Inventory suggested that "[t]here may be a moderate tendency for [Plaintiff] to exaggerate problems," and Rebecca Still noted that "[t]he profile should be viewed with caution." Rebecca Still found strong indications of a depressive condition, an anxiety condition, and somatoform disorder. She also noted that Plaintiff had a pattern of eccentricity, withdrawal, and detachment from other persons. She noted that Plaintiff was likely to maintain a minimal level of functioning, depending on others for support. (Tr. 526). On the Beck Depression Inventory II, Plaintiff scored in the "severe" depression range. On the Multidimensional Anxiety Questionnaire, which Rebecca Still noted appeared to be valid, Plaintiff scored in the "severe" clinical severity range. (Tr. 527).

On the Kaufman Brief Intelligence Test 2, Plaintiff's intellectual functioning was in the "borderline" range; however, that was not considered an optimal sample of her performance due to her distractibility and the fact that she texted on her cell phone during the test. (Tr. 528). Rebecca Still also assessed potential problems with Plaintiff's writing, test-taking, active working memory, arithmetic computation, understanding textbooks and works of fiction, comprehension of higher level sentences, ability to draw inferences, sense of body position, activities demanding rapidly executed motor patterns, short-term memory, sequential memory, concentration on math problems or writing, and visual-motor integration. (Tr. 529-30).

Rebecca Still assessed Plaintiff with AD/HD, post-traumatic stress disorder, generalized anxiety disorder, major depressive disorder, substance dependence in remission, and borderline

personality disorder, rule out borderline intellectual functioning. She assigned a GAF score of 50. (Tr. 532).

On February 9, 2010, Rebecca Still added an addendum listing many clinical symptoms of inattention and hyperactivity-impulsivity that were reported on the Conners' Adult ADHD Rating Scale. (Tr. 536-38). For example, Plaintiff reported that she makes careless mistakes, has difficulty sustaining attention in tasks, has trouble listening to what other people are saying, is disorganized, does not like job activities where she has to think a lot, is easily distracted, is always moving even when she should be still, is bored easily, talks too much, says things without thinking, and interrupts others. (Tr. 536-37).

### 5. REPORT AND LETTER OF REBECCA STILL, M.A., LICENSED PSYCHOLOGIST – MARCH 1, 2010

On March 1, 2010, Rebecca Still completed a report describing her opinions regarding Plaintiff's physical and mental impairments. (Tr. 559-63). Rebecca Still stated that Plaintiff had been treated in "our clinic" on December 16, 2009, and that her last treatment date was February 24, 2010. However, she also stated, "I haven't seen Evelyn for treatment," suggesting that the treatment at her clinic was done by someone else, likely Laura Still. (Tr. 559). She rated Plaintiff's ability as "poor" or "none" in the following areas: follow work rules; relate to coworkers; deal with public; use of judgment; interact with supervisor(s); deal with work stress; function independently; maintain attention/concentration; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex job instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. (Tr. 562-63). However, she indicated that Plaintiff had a "fair" ability to understand, remember, and carry out simple job instructions. (Tr. 563).

In a letter dated the same day, Rebecca Still stated that Plaintiff was seriously limited in most work-related skills; has deficiencies of attention, concentration, and persistence; has a low frustration tolerance; is unable to maintain her focus and attention; would have great difficulty obtaining and maintaining gainful employment even with treatment; has no useful ability to function in the areas of dealing with work stress and maintaining concentration and attention; has much difficulty paying close attention to details; makes careless mistakes; has limited intellectual functioning; would have much difficulty understanding and remembering instructions on a day-to-day basis; would require continual reminders, coaching, and reinforcement to retain information; would be unable to maintain regular attendance; and is limited in social interaction with others.  She opined that Plaintiff would be unable to obtain and maintain gainful employment due to her mental disabilities.  (Tr. 564).

### D.  VOCATIONAL EVIDENCE

Vocational Expert Jennifer L. Sullivan testified at the hearing.  (Tr. 67-72).  The ALJ posed the following hypothetical:

> [P]lease assume a younger individual with a high school education, who can lift and carry 20 pounds occasionally and 10 pounds frequently.  The individual can sit for about six hours during an eight-hour workday, and stand or walk for about six hours during an eight-hour workday.  The individual can occasionally climb, balance, stoop, kneel, crouch, and crawl.  The individual can occasionally reach overhead.  The individual should avoid concentrated exposure to vibrations and hazards such as unprotected heights.  The individual can understand, remember, and carry out simple, routine, and repetitive tasks.  The individual can respond appropriately to supervision, coworkers, and usual work situations, but have no contact with the general public.  The individual can perform low-stress work, which I define as occasional decision-making and few changes in workplace settings.

(Tr. 69-70).  The VE testified that such a person could do light and/or sedentary unskilled work, including work as a hand bander (DOT code 920.678-026; 1,600 jobs in Missouri), laundry worker (361.684-014; 20,000 jobs in Missouri), and final inspector (727.687-054; 8,900 jobs in

Missouri). (Tr. 70-71). The ALJ added to the first hypothetical that the individual could have only occasional contact with coworkers, and the VE testified that that would reduce the numbers of those jobs by about half. (Tr. 71). The ALJ then added to the first hypothetical that the individual could sit, stand, and walk for a combined total of less than eight hours during an eight-hour workday; that the individual would be required to take frequent unscheduled breaks; and that the individual would miss two or more days of work per month, would be off task or off pace, or would be incapable of even performing low-stress jobs. (Tr. 71-72). The VE testified that there would be no full-time work for such a person. (Tr. 72).

### III.    DECISIONS OF THE ALJ AND THE APPEALS COUNCIL

The ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. 22). He found that Plaintiff had the following severe impairments: cervical spondylolysis, left knee patellofemoral syndrome, bipolar disorder, major depressive disorder, generalized anxiety disorder, attention deficit/hyperactivity disorder, borderline personality disorder, and alcohol and cannabis abuse in remission. He found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 22).

The ALJ found that the claimant had the residual functional capacity to occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry up to 10 pounds; to sit for about six hours of an eight-hour workday and walk and/or stand for at least six hours during an eight-hour workday; and to occasionally climb ramps/stairs, balance, stoop, kneel, crouch, crawl, and reach overhead. He found that she was to avoid concentrated exposure to vibrations and hazards, such as unprotected heights and heavy machinery. He found that she could understand, remember and carry out simple, routine, and repetitive tasks; that she could respond appropriately to

supervision and usual work situations; that she could have only occasional contact with coworkers and no contact with the general public; and that she could perform low stress work (defined as occasional decision making and occasional changes in work place settings). (Tr. 24). In his decision, the ALJ gave "great weight" to the opinion of the state agency reviewing psychologist, Dr. Maddox. (Tr. 28). He gave "no weight to the opinions and findings of [Rebecca] Still where they are not supported by the signs, symptoms, and medical findings in the record." (Tr. 29).

The ALJ found that Plaintiff was unable to perform her past relevant work. (Tr. 29). He found that based on her age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that Plaintiff could perform. In making that finding, he relied on the testimony of a Vocational Expert. The ALJ found that Plaintiff had not been under a disability through the date of his decision. (Tr. 30).

In reviewing the ALJ's decision, the Appeals Council agreed with the ALJ's findings at each step of the five-step sequential evaluation process and adopted the bulk of the ALJ's conclusions and findings. The Appeals Council upheld the ALJ's RFC finding and also specifically found that the ALJ had not erred in evaluating the opinions of Rebecca Still, M.A. The Appeals Council made some modifications to the ALJ's decision related to the ALJ's statements regarding the specific provisions of the Act under which Plaintiff had applied for benefits, as well as the ALJ's assessment of the opinion of a single decisionmaker regarding Plaintiff's physical impairments. (Tr. 11). The modified findings are not relevant to the present appeal.

# IV.    **GENERAL LEGAL PRINCIPLES**

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the ALJ determines whether the claimant can return to

his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## V. DISCUSSION

On appeal, Plaintiff argues that the ALJ erred by failing to give adequate weight to the opinions of Rebecca Still, a licensed psychologist, and Laura Still, a Licensed Clinical Social Worker.

### A. OPINION OF REBECCA STILL

Plaintiff first argues that the ALJ erred by giving no weight to the opinions of Rebecca Still, M.A., a licensed psychologist, who examined Plaintiff and offered numerous statements regarding Plaintiff's severe mental limitations an inability to work. (Tr. 524-33, 536-37, 559-64).

The ALJ is required to consider every medical opinion he or she receives. *See* 20 C.F.R. §§ 404.1527(c); 416.927(c) ("Regardless of its source, we will evaluate every medical opinion

we receive."). When the opinion is from a treating source, the opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). This is because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Where an opinion is not given controlling weight as the opinion of a treating source, the weight given to the opinion depends on a number of factors, including whether the source has examined the claimant, whether and how the source has treated the claimant, the relevant evidence provided in support of the opinion, the consistency of the opinion with the record as a whole, whether the opinion is related to the source's area of specialty, and other factors. 20 C.F.R. §§ 404.1527(c), 416.927(c).

For her argument that the ALJ erred in his consideration of Rebecca Still's opinions, Plaintiff relies extensively on case law, regulations, and Social Security Rulings discussing the weight that must be given to treating sources and the specific reasons the ALJ must give for the weight given to a treating source's opinion. *See* Pl's Br. at 12-14. The primary problem with Plaintiff's argument is that the record contains no indication that Rebecca Still ever treated Plaintiff. (Tr. 29). Although *Laura* Still apparently provided counseling to Plaintiff on several occasions (Tr. 539-41, 543, 545, 546), Rebecca Still did not. Indeed, on the form Rebecca Still completed on March 1, 2010, describing her opinions regarding Plaintiff's limitations, Rebecca

Still stated, "I have not seen Evelyn for treatment." (Tr. 559). Instead, the record indicates that Rebecca Still performed a consultative examination for purposes of helping Plaintiff with her appeal for disability benefits.[10] (Tr. 524-33). Thus, as the ALJ properly recognized, Rebecca Still is not a treating source, and her opinions are not entitled to controlling weight as the opinion of a treating source. (Tr. 29). *See Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) ("A single evaluation by a nontreating psychologist is generally not entitled to controlling weight.").

In addition, the ALJ did consider the opinions of Rebecca Still, as he was required to do, and he gave several good reasons for discounting them.

First, as discussed above, the ALJ pointed out that Rebecca Still had not actually treated Plaintiff. (Tr. 29).

Second, the ALJ properly considered the fact that in her report, Rebecca Still questioned the validity of several of her tests and observations. (Tr. 29). For example, in the "behavioral observation" section of her report, she stated, "This does not represent an optimal sample of [Plaintiff's] performance due to her distractibility." (Tr. 524-25). In the "attentional problems" section, she stated, "questions were answered in an inconsistent manner and the above results, therefore, are likely to be invalid." (Tr. 525). In the "personality assessment" section, she stated that "there may be a moderate tendency for [Plaintiff] to exaggerate problems" and that "this profile should be viewed with caution." (Tr. 526). The ALJ properly considered these cautionary statements in assessing the weight to be given to Ms. Still's opinions. (Tr. 29). *See*

---

[10] Plaintiff asserts that Rebecca Still "met with Plaintiff on at least two occasions." *See* Pl's Br. at 15. Although Rebecca Still completed two reports regarding Plaintiff's capabilities, it does not appear to the undersigned that Rebecca Still actually met with Plaintiff on any occasion other December 17, 2009. (Tr. 524-33, 559-63). However, the undersigned's recommendation is the same regardless of whether Rebecca Still met with Plaintiff once or twice. *See Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) ("Vega's March letter . . . is not entitled to controlling weight as a medical opinion of a treating source. When she filled out the checklist, Vega had only met with [plaintiff] on three prior occasions.").

*Neal ex rel. Walker v. Barnhart*, 405 F.3d 685, 690 (8th Cir. 2005) (upholding the ALJ's decision to disregard diagnoses of mental retardation where the diagnosing doctors had noted that the IQ test scores on which those diagnoses were based likely underestimated her cognitive functioning); *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010) (finding it proper for the ALJ to consider a doctor's suggestion that a plaintiff was exaggerating her symptoms in assessing the credibility of those symptoms).

Third, the ALJ properly pointed out that Rebecca Still's opinion that Plaintiff would be unable to obtain and maintain gainful employment was an opinion reserved to the Commissioner and is not determinative of the issue of disability. (Tr. 29, 564). *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."); *Brown v. Astrue*, 611 F.3d 941, 952 (8th Cir. 2010) ("'The ALJ correctly noted . . . that the ultimate conclusion of whether [the plaintiff] could sustain gainful employment is a question for the Commissioner.") (internal quotation marks omitted).

The undersigned further notes that the ALJ did not completely disregard all of Rebecca Still's opinions, but only her opinions "where they are not supported by the signs, symptoms and medical findings in the record." (Tr. 29). The RFC the ALJ assessed does contain significant mental restrictions: the ALJ found that Plaintiff was limited to simple, routine, and repetitive type tasks; could have only occasional contact with coworkers and no contact with the general public; and could perform only low stress work. (Tr. 24). These findings are consistent with the ALJ having given some weight to Rebecca Still's opinions. *See Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006) (holding that the ALJ's inclusion of "significant limitations" on the

plaintiff's physical abilities in the RFC demonstrated that the ALJ had given some credit to the opinions of treating physicians, even though the ALJ had not given the opinions controlling weight). The ALJ's RFC is also consistent with the opinion of nonexamining psychologist Marc Maddox, Ph.D., who found that Plaintiff had the ability to complete simple, repetitive tasks in an unskilled work environment; could understand, carry out, and remember simple instructions; could make simple work-related decisions; and would function best in an environment where interpersonal contact was limited. (Tr. 322). The ALJ's findings are also consistent with the opinions of consultative examiner, Dr. Tichenor, that Plaintiff's ability to understand and remember instructions and to attend to and complete tasks was likely impaired but not precluded and that Plaintiff could manage money with some minimal supervision. (Tr. 307).

### B. OPINION OF LAURA STILL

Plaintiff also suggests that the ALJ erred by not including the limitations assessed by Laura Still, L.C.S.W., in his RFC and in his hypothetical to the VE. *See* Pl's Br. at 15.

The undersigned first notes that a licensed clinical social worker is not an "acceptable medical source" under the regulations, but is rather an "other" medical source. 20 C.F.R. §§ 404.1513(a) & (d)(1), 416.913(a) & (d)(1); Social Security Ruling 06-03p ("SSR-06-3p") (noting that licensed clinical social workers are "other sources" and not "acceptable medical sources"). Thus, even though Laura Still provided some treatment to Plaintiff, Laura Still was not a "treating source" whose medical opinion may be entitled to controlling weight. *See Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006); SSR 06-03p (noting that "only 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.").

Moreover, Plaintiff does not point to any opinions offered by Laura Still that the ALJ should have considered but did not, nor does she point to any limitations on Plaintiff's functioning that Laura Still identified. Laura Still did conduct an evaluation of Plaintiff in which she noted that Plaintiff had "never had a stable home environment"; that she was irritable on the day of examination; that she was easily frustrated, forgetful, and had difficulty completing tasks; and that she was shy, nervous, worried about things, and had a temper. (Tr. 535). However, Plaintiff does not argue, nor does the undersigned find, that these statements are inconsistent with the ALJ's mental RFC assessment restricting her to simple, routine tasks involving only occasional contact with others. Subsequent records of Laura Still's treatment of Plaintiff are also devoid of any statements that undermine the RFC assessed by the ALJ. (Tr. 539-41, 543, 545-46). The undersigned finds that the ALJ did not err by failing to include any limitations described by Laura Still in his RFC.

## VI.     CONCLUSION

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of February, 2013.